IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

| | |
|---|---|
| **MICHAEL D. HAM et al.,** | ) |
| | ) |
| Plaintiffs, | ) |
| v. | )   Case No. 2:09-cv-02145 |
| | ) |
| **SWIFT TRANSPORTATION CO.,** | ) |
| **INC., Nevada Corporation,** | ) |
| | ) |
| Defendant. | ) |

**ORDER DENYING DEFENDANT'S MOTION TO DISMISS**

Before the Court is Defendant Swift Transportation Co., Inc.'s ("Swift") Motion to Dismiss Amended Complaint Pursuant to Federal Rules of Civil Procedure 12(b)(1) and (b)(6) filed on August 26, 2009. (D.E. #43.) Plaintiffs Michael Ham et al. (collectively, "Plaintiffs") filed a response in opposition on November 8, 2009, and Swift filed a reply on November 25, 2009. For the reasons stated below, Swift's motion to dismiss is **DENIED**.

**I. BACKGROUND**[1]

Plaintiffs Michael D. Ham and Jemonia L. Ham are residents of the State of Connecticut, while Plaintiffs Dennis R. Wolf and Francis Wolf are residents of the State of Illinois. (Pls.' Am. Compl. ¶ 5.) Plaintiffs have filed this case as a putative class action against Swift, a Nevada corporation with its principal place of business located in Phoenix, Arizona. (Id. ¶ 6.)

---

[1] The following factual recitation is taken from Plaintiffs' Amended Complaint and is assumed to be true for purposes of this motion only.

**A. General Allegations**

From March 2005 through January 2008, Swift offered a "comprehensive 23-day training course" for individuals seeking to obtain a Tennessee Class A Commercial Drivers License ("CDL"), a license enabling the holder to drive commercial motor vehicles. (Id. ¶ 7.) Swift operated as both a trade school—known as the Swift Driving Academy ("Swift Academy") in Millington, Tennessee—and a third-party CDL tester for the State of Tennessee. (Id. ¶ 8, 10.)

In exchange for their tuition, Swift Academy students received instruction and training materials on how to operate a commercial grade tractor trailer. (Id. ¶¶ 10-11.) Additionally, students who lived more than fifty miles from Millington were bused to the school and received housing in the nearby Admiralty Suites & Inn. (Id. ¶ 11.) The Swift Academy provided a certificate to students who successfully completed the 207-hour course. (Id.)

As a third-party tester, Swift conducted CDL tests for its students and for members of the public at large for a "seating fee" of $150 to $250, which Swift retained, not remitting it to the State of Tennessee or any other entity. (Id. ¶ 12.) Swift's role as a third-party tester involved administering and scoring the driving and "skills" portions of the CDL test. (Id. ¶ 13.)

The Swift Academy offered its students the ability to finance their tuition through a "Tuition Installment Contract." (Id. ¶ 15.) Plaintiffs do not sue for breach of the Tuition Installment Contract, nor do Plaintiffs allege that the training they received was deficient or that Swift guaranteed that any student would pass the Tennessee CDL test. (Id. at ¶ 16.) Rather, Plaintiffs allege that Swift, in its role as a third-party tester,

knowingly or recklessly failed to comply with state and/or federal regulations in administering CDL tests. (Id. ¶18.) Specifically, Swift's instructors doubled as testers for its CDL tests in violation of testing regulations. (Id.) Swift also failed to conduct the "skills" portion of the CDL test, instead falsifying paperwork to indicate that examinees had passed that portion of the examination. (Id.) Furthermore, to appear to comply with the Tennessee law requiring that recipients of a Tennessee CDL be permanent residents of the state, Swift claimed that its out-of-state students resided at the Admiralty Inn & Suites. (Id. ¶¶ 14, 18.)

Officers from the FBI and the U.S. Department of Transportation ("U.S. DOT") raided Swift's Millington training and testing facility in February 2008, and, at that time, the U.S. DOT temporarily suspended Swift's ability to issue CDLs. (Id. ¶ 21.) In December 2008, following an investigation, the U.S. DOT and the Tennessee Department of Safety ("TDOS") found that Swift had violated state and federal law in conducting CDL testing. (Id. ¶ 22.) TDOS then terminated Swift as a third-party tester, and Swift, after initially appealing this decision, eventually declined to further prosecute its appeal. (Id. ¶¶ 22-23.)

U.S. DOT and TDOS also determined that the licenses of all drivers who had obtained their CDLs through Swift between May 2005 and January 2008 were compromised as a result of Swift's faulty testing procedures. (Id. ¶ 25.) TDOS notified holders of Tennessee CDLs issued through Swift that they would have to retake the CDL test and pay a retesting fee by a certain date or their CDLs would be terminated. (Id. ¶ 26.) In addition, TDOS and U.S. DOT contacted other states to notify them that individuals who had obtained CDLs in their states based on a Tennessee CDL issued

through Swift held compromised credentials. (Id. ¶ 27.) These states then notified the affected CDL-holders that their licenses had been compromised and that they would be required to pay for and pass retests or have their CDLs revoked. (Id.) Plaintiffs do not challenge the legality of the actions taken by TDOS or any other state's licensing agency. (Id. ¶¶ 28-29.)

**B. Allegations of Plaintiffs Dennis Wolf and Francis Wolf**

Plaintiffs Dennis Wolf and Francis Wolf ("Wolf Plaintiffs") traveled to Tennessee, stayed at the Admiralty Suites & Inn, and received training at the Swift Academy. (Id. ¶ 31.) In June 2006, the Wolf Plaintiffs each paid a $150 fee to Swift for CDL testing. (Id.) Having received Tennessee CDLs through Swift, the Wolf Plaintiffs moved to Illinois, where they obtained Illinois CDLs on the basis of their Tennessee licenses. (Id. ¶ 32.) In December 2008, the State of Illinois sent notices to the Wolf Plaintiffs telling them that, due to irregularities in Swift's testing, they would be required to take the CDL test again within a certain timeframe or lose their CDLs. (Id. ¶ 33.) Because the Wolf Plaintiffs were both away from home trucking for their employer, by the time they received their notices from the State of Illinois, the period for retesting had expired, their CDLs were suspended, and they lost their trucking jobs. (Id.) Without access to a truck through their employer, the Wolf Plaintiffs could not submit to retesting, and their CDLs were finally terminated. (Id.)

**C. Allegations of Plaintiffs Michael Ham and Jemonia Ham**

Like the Wolf Plaintiffs, Plaintiffs Michael Ham and Jemonia Ham ("Ham Plaintiffs") came to Tennessee in 2006 to be trained at the Swift Academy and were then tested by Swift for a fee of $150 each. (Id. ¶ 31.) After receiving their Tennessee CDLs

through Swift, the Ham Plaintiffs moved to Connecticut, where they received Connecticut CDLs based upon their Tennessee licenses. (Id. ¶ 32.) In February 2009, the State of Connecticut notified the Ham Plaintiffs that, as a result of Swift's irregularities, their CDLs would be suspended unless they were retested. (Id. ¶ 34.) Plaintiff Michael Ham paid $210 for training at a different school and then paid $300 to take Connecticut's CDL test. (Id.) Plaintiff rented a truck for the retest, but was unable to pass, resulting in the loss of his CDL. (Id.) Plaintiff Jemonia Ham was unable to obtain a truck for her retest and thus lost her CDL. (Id.)

### D. Class Allegations and Causes of Action

Swift's failure to comply with state and federal regulations in conducting CDL testing has harmed the named Plaintiffs as well as the members of the class Plaintiffs seek to represent. (Id. ¶ 36.) Those damages include the fee that was paid to Swift for improperly performed testing, costs of retesting, and lost income and opportunities while awaiting retesting. (Id.) Plaintiffs assert causes of action for unjust enrichment, negligence and gross negligence, and negligent supervision. (Id. ¶¶ 45-53.) Plaintiffs also seek punitive damages. (Id. ¶ 54-57.)

## II. LEGAL STANDARD

### A. Legal Standard for Motion under Fed. R. Civ. P. 12(b)(1)

A motion to dismiss under Rule 12(b)(1) of the Federal Rules of Civil Procedure asserts that the court lacks subject matter jurisdiction. A motion to dismiss for lack of subject matter jurisdiction may challenge the sufficiency of the complaint itself—in which case it constitutes a facial attack—or it may challenge the factual existence of subject matter jurisdiction—in which case the motion constitutes a factual attack. United

States v. Ritchie, 15 F.3d 592, 598 (6th Cir. 1994). In ruling upon a facial attack, the court must take as true the allegations of the plaintiff's complaint and construe them in the light most favorable to the plaintiff, but in a factual attack, the court does not presume that the complaint's allegations are true and instead considers other evidence bearing upon the question of subject matter jurisdiction. DLX, Inc. v. Kentucky, 381 F.3d 511, 516 (6th Cir. 2004). When faced with a factual attack, the trial court may, at its discretion, consider affidavits and documents and even conduct a limited evidentiary hearing to resolve any disputes as to jurisdictional facts. Ohio Nat'l Life Ins. Co. v. United States, 922 F.2d 320, 325 (6th Cir. 1990). The plaintiff bears the burden of proving jurisdiction on a motion to dismiss under Rule 12(b)(1). Rogers v. Stratton Indus., Inc., 798 F.2d 913, 915 (6th Cir. 1986); see United Gov't Sec. Officers of Am. v. Akal Sec., Inc., 475 F. Supp. 2d 732, 736 (S.D. Ohio 2006).

**B. Legal Standard for Motion under Fed. R. Civ. P. 12(b)(6)**

A motion to dismiss a complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure only tests whether a cognizable claim has been pled. Scheid v. Fanny Farmer Candy Shops, Inc., 859 F.2d 434, 436 (6th Cir. 1988). To determine whether a motion to dismiss should be granted, the court examines the complaint, which must contain a short and plain statement of the claim showing that the pleader is entitled to relief. See Fed. R. Civ. P. 8(a)(2). It must also provide the defendant with fair notice of the plaintiff's claim as well as the grounds upon which it rests. Conley v. Gibson, 355 U.S. 41, 47 (1957); Westlake v. Lucas, 537 F.2d 857, 858 (6th Cir. 1976). While the complaint need not present detailed factual allegations, to be cognizable it must provide more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not

suffice.  Bell Atlantic Corp. v. Twombly, 127 S. Ct. 1955, 1964-65 (2007); see also Scheid, 859 F.2d at 436-37.

Likewise, the complaint must contain factual allegations sufficient "to raise a right to relief above the speculative level[.]"  Twombly, 127 S. Ct. at 1965 (citation omitted).  The mere possibility that some set of undisclosed facts will support recovery is insufficient to overcome a 12(b)(6) challenge.  Twombly, 127 S. Ct. at 1968; see also Ashcroft v. Iqbal, 129 S. Ct. 1937, 1950 (2009) ("[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss.").  On a motion to dismiss under Rule 12(b)(6), the court accepts as true all factual allegations made in the complaint and construes them in the light most favorable to the plaintiff.  Neitzke v. Williams, 490 U.S. 319, 326-27 (1989); Sensations, Inc. v. City of Grand Rapids, 526 F.3d 291, 295-96 (6th Cir. 2008); Windsor v. The Tennessean, 719 F.2d 155, 158 (6th Cir. 1983).  The court, however, only takes as true well-pled facts, and it will not accept legal conclusions or unwarranted factual inferences.  Lewis v. ACB Bus. Servs., Inc., 135 F.3d 389, 405-06 (6th Cir. 1998); see Iqbal, 129 S. Ct. at 1949.

## III. ANALYSIS

### A. Ripeness and Exhaustion

Swift argues that Plaintiffs' complaint should be dismissed in its entirety under Rule 12(b)(1) of the Federal Rules of Civil Procedure because Plaintiffs have not availed themselves of available administrative remedies and therefore Plaintiffs' claims are not yet ripe for adjudication.

The doctrine of ripeness precludes courts from entering into disputes that are speculative, contingent, and not yet amenable to judicial review.  Kentucky Press Ass'n,

Inc. v. Kentucky, 454 F.3d 505, 509 (6th Cir. 2006).  "The ripeness doctrine not only depends on the finding of a case or controversy and hence jurisdiction under Article III, but it also requires that the court exercise its discretion to determine if judicial resolution would be desirable under all of the circumstances."  Brown v. Ferro Corp., 763 F.2d 798, 801 (6th Cir. 1985).  The related requirement of exhaustion of administrative remedies is largely—though not exclusively—a creature of statute and is imposed where appropriate to fully develop issues in a contest over an agency's actions.  See Sims v. Apfel, 530 U.S. 103, 108-110 (2000); see also Coalition for Gov't Procurement v. Federal Prison Indus., Inc., 365 F.3d 435, 453-64 (6th Cir. 2004).  Exhaustion protects agency authority by allowing the agency to correct its own mistakes and promotes efficiency by allowing claims to be developed and possibly resolved quickly and economically without resorting to litigation in the first instance.  Woodford v. Ngo, 548 U.S. 81, 88-89 (2006); Fazzini v. Northeast Ohio Correctional Ctr., 473 F.3d 228, 232 (6th Cir. 2006).

According to Swift, the revocation of Plaintiffs' CDLs is still subject to challenge in administrative proceedings before the TDOS and other responsible state agencies and, as a result, Plaintiffs have not exhausted available administrative remedies.  Plaintiffs, however, do not contest the determination by any licensing agency that their licenses were the product of Swift's flawed testing procedures and thus invalid.  Rather, Plaintiffs affirmatively state that they agree with the determination that their licenses were compromised and thus subject to revocation, which is why Plaintiffs seek redress from Swift—the entity allegedly to blame for their invalidated licenses.  Neither the Court nor Swift can compel Plaintiffs to challenge an administrative decision with which they do not find fault.  Furthermore, Plaintiffs seek money damages from Swift, not to have state

licensing authorities change their decisions revoking Plaintiffs' licenses. Thus, the Court rejects Swift's arguments regarding exhaustion.

Swift also submits that Plaintiffs' claims are not ripe, again, because Plaintiffs have not challenged the revocation of their licenses through administrative remedies. Of course, if Plaintiffs do not believe the relevant state administrative agencies erred, then Plaintiffs should not be forced to seek administrative redress. Moreover, Plaintiffs' complaint alleges that Plaintiffs have already had their licenses revoked by state authorities. The injury Plaintiffs describe is not hypothetical or speculative, but instead constitutes an allegation of final harm that is ripe for judicial review. Accordingly, the Court rejects Swift's arguments as to ripeness and exhaustion.

**B. The Economic Loss Doctrine**

In this case, Plaintiffs assert causes of action against Swift for negligence, gross negligence, and negligent supervision—all under the theory that Swift was negligent in the provision of CDL testing services to Plaintiffs. Swift contends that Plaintiffs' negligence claims—the second and third counts in Plaintiffs' Amended Complaint—must be dismissed under the economic loss doctrine, "a judicially created principle that reflects an attempt to maintain separation between contract law and tort law by barring recovery in tort for purely economic loss," Lincoln Gen. Ins. Co. v. Detroit Diesel Corp., 293 S.W.3d 487, 488 (Tenn. 2009).[2] According to Swift, the economic loss doctrine applies to all actions brought in tort, while Plaintiffs argue that the doctrine only applies to cases involving defective products and not to cases arising from the negligent provision of services. Although the Tennessee Supreme Court has stated that "Tennessee has joined

---

[2] The Tennessee Supreme Court has further said that "[t]he economic loss doctrine is implicated in products liability cases when a defective product damages itself without causing personal injury or damage to other property." Lincoln Gen. Ins. Co., 239 S.W.3d at 489.

those jurisdictions which hold that product liability claims resulting in pure economic loss can be better resolved on theories other than negligence," Ritter v. Custom Chemicides, Inc., 912 S.W.2d 128, 133 (Tenn. 1995), Tennessee's highest court has never addressed whether the economic loss doctrine applies outside of the products liability context. "If the forum state's highest court has not addressed the issue, the federal court must ascertain from all available data, including the decisional law of the state's lower courts, restatements of law, law review commentaries, and decisions from other jurisdictions on the 'majority' rule, what the state's highest court would decide if faced with the issue." Am. and Foreign Ins. Co. v. Bolt, 106 F.3d 155, 158 (6th Cir. 1997) (quoting Grantham and Mann v. Am. Safety Prods., Inc., 831 F.2d 596, 608 (6th Cir. 1987)).

For support, Swift relies on three cases—one published, two unpublished—from the Tennessee Court of Appeals.[3] In the sole published Tennessee case Swift cites directly addressing the issue, United Textile Workers v. Lear Siegler Seating Corp., the court held that the economic loss doctrine precluded a suit by workers seeking lost wages against a factory owner whose propane tank leaked and caused the workers to lose a day of pay when their places of employment were closed. 825 S.W.2d 83, 84 (Tenn. Ct. App. 1990). The court stated that it was "disallow[ing] recovery for purely economic loss absent physical injury or property damage." Id. at 86. One judge dissented from the court's application of the economic loss doctrine, arguing that the majority was "mechanically applying" a "dated" rule. Id. (Franks, J., dissenting).

---

[3] The two unpublished cases Swift cites are Rural Developments, LLC v. Tucker, No. M2008-00172-COA-R3-CV, 2009 WL 112541 (Tenn. Ct. App. Jan. 14, 2009) and Amsouth Erectors, LLC v. Skaggs Iron Works, Inc., No. W2002-01944-COA-R3-CV, 2003 WL 21878540 (Tenn. Ct. App. Aug. 5, 2003). Neither of these opinions provides the court's reasoning for applying the economic loss doctrine to cases not involving the sale of goods.

10

The Tennessee Court of Appeals has since implicitly restricted the economic loss doctrine to claims involving products liability or the sale of goods, at least where the plaintiff can establish a sufficiently direct relationship between the defendant's negligent act and the plaintiff's economic loss.  Trinity Indus., Inc. v. McKinnon Bridge Co., Inc., 77 S.W.3d 159, 173-74, 182 (Tenn. Ct. App. 2001) (appearing to limit economic loss doctrine to cases involving sale of goods under the UCC) (discussing Sain v. ARA, 660 S.W.2d 499 (Tenn. Ct. App. 1983)).  Furthermore, in a subsequent unpublished opinion from the Tennessee Court of Appeals written by now Justice Koch of the Tennessee Supreme Court, the court discussed the economic loss doctrine, apparently confining its applicability to the sale of goods by stating the following:

> The economic loss rule is a judicially created principle that requires parties to live by their contracts rather than to pursue tort actions for purely economic losses arising out of the contract. The rule comes into play when the purchaser of a *product* sustains economic loss without personal injury or damage to property other than the *product* itself.  In that circumstance, the purchaser must seek a remedy in contract, not in tort. Thus, when a purchaser's expectations in a sale are frustrated because a *product* does not work properly, the purchaser's remedies are limited to those prescribed by the law of contract.

McLean v. Bourget's Bike Works, Inc., No. M2003-01944-COA-R3-CV, 2005 WL 2493479, at *5 (Tenn. Ct. App. Oct. 7, 2005) (internal citations omitted and emphasis added).  Moreover, federal courts applying Tennessee law have declined to extend the economic loss doctrine beyond cases involving the sale of goods.  See, e.g., Corso Enters., Inc. v. Shop at Home Network, Inc., No. 3:04-0260, 2005 WL 2346986, at *6-7 & n.7 (M.D. Tenn. Sept. 26, 2005) ("Thus, governance by the UCC of the contract at issue is a prerequisite to the application of the economic loss doctrine and resulting preclusion of recovery in tort.").

In confronting whether the economic loss doctrine should apply to transactions involving services, the Wisconsin Supreme Court noted that the "genesis of the economic loss doctrine lies in products liability cases." Ins. Co. of North Am. v. Cease Elec. Inc., 688 N.W.2d 462, 467 (Wis. 2004). Application of the economic loss doctrine to cases involving defective products is not surprising, the court reasoned, because the Uniform Commercial Code ("UCC") sets forth the full series of rights and remedies available to an aggrieved purchaser who suffers only economic losses. Id. at 467-68. Since the UCC is inapplicable to service contracts, the court held that it would not apply the economic loss doctrine to suits seeking recovery for negligently provided services. Id. at 470, 472. This rationale for limiting the economic loss doctrine echoes that expressed by the Tennessee Supreme Court in deciding to limit a plaintiff suing for a defective product who sustained only economic losses to remedies under the UCC instead of allowing the plaintiff to proceed under a theory of negligence. Ritter, 912 S.W.2d at 133 & n.8. If the existence of UCC remedies provides the justification for not allowing the plaintiff to sue in tort, the absence of UCC remedies should counsel in favor of allowing tort recovery. Thus, the Court believes that, like the Wisconsin Supreme Court, the Tennessee Supreme Court would rely on the fact that the economic loss doctrine has its origins in the UCC to preclude application of the doctrine to suits not involving UCC remedies, specifically those concerning the provision of services.

Considering all appropriate indicia, the Court concludes that the Tennessee Supreme Court would decline to extend the economic loss doctrine to cases involving the provision of services if squarely faced with this question. Accordingly, Swift's motion to dismiss Plaintiffs' negligence claims is denied.

## IV. CONCLUSION

For the reasons stated above, Swift's motion to dismiss is **DENIED**.

**IT IS SO ORDERED**, this the 17th day of March, 2010.

         s/Bernice Bouie Donald
         **BERNICE BOUIE DONALD**
         **UNITED STATES DISTRICT JUDGE**